UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

DANIELLE LANGAN,

Plaintiff,

-against-

STARBUCKS CORPORATION D/B/A STARBUCKS
COFFEE COMPANY

Defendant.

Case No. 23-CV-5056

Plaintiff designates **Middlesex County** as the place of trial

**SUMMONS**

TO THE ABOVE NAMED DEFENDANT:

YOU ARE HEREBY SUMMONED to answer the complaint in this action and to serve a copy of your answer, or if the complaint is not served with this summons, to serve a notice of appearance, on the plaintiffs' attorney(s) within 20 days after the service of this summons, exclusively of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New Jersey); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Respectfully Submitted,

Dated    Brooklyn, New York
         August 16, 2023

_____
Vincent Miletti, Esq.
The Law Offices of Vincent Miletti, Esq.
10 Halletts Point, Ste 1742
Astoria, New York 11102
(609) 353-6287 (Direct)
VMiletti@Milettilaw.com
*Attorney for Plaintiff*

To:    Michael Kessel, Esq.
       Littler Mendelson
       One Newark Center
       1085 Raymond Blvd, 8th Floor
       Newark, New Jersey 07102
       *Attorney for the Defendant*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| DANIELLE LANGAN<br><br>                               Plaintiff,<br><br>– v -<br><br>STARBUCKS CORPORATION D/B/A STARBUCKS COFFEE COMPANY<br><br>                             Defendant, | **Case No. _____**<br><br>**VERIFIED COMPLAINT &<br>JURY DEMAND** |

Plaintiff DANIELLE LANGAN ("Langan" or "Plaintiff"), by and through its attorneys, Miletti Law P.C., d/b/a The Law Offices of Vincent Miletti, Esq., states as follows by way of Verified Complaint against defendant STARBUCKS CORPORATION D/B/A STARBUCKS COFFEE COMPANY ("Starbucks" or "Defendant"), upon knowledge with respect to Schuman's own acts and upon information and belief with respect to all other matters:

### INTRODUCTION

1.    By way of introduction, the Plaintiff in this matter, Ms. Danielle Langan was a 20+ year employee with an exceptional record.  Plaintiff enjoyed a meteoric rise from barista in November 2000, to Shift Supervisor within 6 months, through her promotion to Store manager in May 2003.  During her career, she enjoyed many accolades, including the North Star Hero award, one of the most prestigious awards that Starbucks could give.  Plaintiff even received praise from management as recent as March 15, 2020.  While historically, her career has been fantastic and her performance has always been top grade, great memories are often short lived— and there is no force like that of systemic and invidious discrimination.

2.      In the midst of a global pandemic, Plaintiff was wrongly accused of racism when Starbucks attempted to deliver T-shirts conveying messages in support of the "Black Lives Matter" movement to a closed store. Plaintiff was blamed for Defendant's failure to properly deliver the shirts, with management alleging Plaintiff refused the package on purpose.

3.      Defendant refused to accept their error and escalated their discrimination against Plaintiff to advance their agenda. When Plaintiff was out on protected leave for contracting an aggressive case of COVID-19, management wrongfully terminated Plaintiff's employment and used false and un-substantiated accusations of prejudice and poor leadership to support their decision.

4.      Beginning in January 2021, after finalizing their class action issue with the Equal Employment Opportunity Commission ("EEOC"), Starbucks began a campaign in which they were going to correct their past historical wrongs against minorities, particularly African Americans.  Part of this new image and drive at Starbucks, was to take a firm stance against discrimination in the workplace. Unfortunately for Ms. Langan, this new political ethos that Starbucks sought to employ found her improperly in the line of fire.

5.      Starbucks needed a fall person—a sacrificial lamb to show that they were taking the allegations of discrimination against African American's seriously.  Certainly, Starbucks believed that the best way to approach this was to find a Caucasian female and just make her the target of this historical correction campaign! Ms. Langan was that perfect candidate.  She is trusting, outspoken, and wears her heart on her sleeve—just the right person to set up to the be model for their new aggressive position on how they would treat alleged discrimination against minorities.

6.      Disregard the fact that senior management treats race relations and particular cultures more like a marketing campaign rather than actual human beings (because hey, there is nothing money can't cure—right?), and that all their previous issues with race are going to be cured by funding money and placing employees in positions they may not be the most qualified to serve, since the placement is not based on merit, but rather, an "accelerated program" – no, this is how they are going to show their commitment to the African American community—by **improperly firing a single mother of 3, who after the military, suffering from Post-Traumatic Stress Disorder (PTSD), spent her entire career working for Starbucks, and engaging in a campaign of discrimination, harassment and retaliation, predicated by their particular distain for her race, sprinkled with a little bit of gender discrimination and disability discrimination**.  Certainly, Starbucks has shown that they could whip up a case of invidious race discrimination and retaliation against Caucasian females, suffering from disabilities, older than 40, as fast as they could whip up a large Teavana shaken peach citrus white tea infusion with heavy cream and vanilla syrup.

7.      It is worth noting that they could not have picked a worse candidate to make a model of their campaign of discrimination against Caucasian people – they picked an employee who enjoys friendships, relationships and community with all races equally, and has perhaps one of the most diverse group of friends anyone could ever have, and one who basically enjoys extracurricular activities and hobbies from all walks of life.   Of all the people in the world that they are trying to turn into a modern David Duke, they are sadly mistaken.

8.      Ironically, this campaign to trash Ms. Langan has been organized and facilitated by a group of other Caucasians within Starbucks who seem to think they were the Post Civil War Radical Republicans, but in reality, their public facing actions are nothing more than petty virtue

signaling. As Starbucks tries to make it appear that they are making big moves, effectuating dramatic change, the reality is that just like how they missed the target on understanding race relations within the African American community, they further missed the target on how to spot true racism. Unfortunately, they have destroyed the life of a single mother of 3, who after the military, dedicated her life to Starbucks, in the process.

9.    Plaintiff, after being the recipient of this invidious campaign of discriminatory treatment, now brings claims against Starbucks pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42. U.S.C. §2000e, et. seq. ("Title VII"), the Civil Rights Act of 1866, as amended, 42 U.S.C. §1981, the New Jersey Law Against Discrimination ("NJLAD"), as amended, N.J.S.A. § 10:501, et seq., the Americans with Disabilities Act ("ADA"), and other related state and common law claims.

## PARTIES

10.    Plaintiff, DANIELLE LANGAN, is an individual with a principal place of residence, located Hazlet, New Jersey 07730.

11.    Defendant STARBUCKS CORPORATION D/B/A STARBUCKS COFFEE COMPANY is organized under the laws of Washington with its headquarters located at 2401 Utah Avenue, South, Seattle, Washington, 98134.

12.    At all material times, Defendant maintained locations throughout the State of New Jersey, including without limitation, in North Brunswick and other locations within New Jersey.

13.    At all times material hereto, Plaintiff worked out of the primary shop located in North Brunswick, New Jersey and traveled to Defendants' other locations in New Jersey, including but not limited to Matawan, Marlboro, Manalapan , Middletown , Edison, freehold, Woodbridge mall , Woodbridge and Menlo Park.

14.    Defendant is engaged in an industry affecting interstate commerce and regularly does business in the State of New Jersey.

15.    At all times material hereto, Defendant employed more than fifteen (15) employees.

16.    At all times material hereto, Defendant acted by and through its authorized agents, servants, workmen, and/or employees acting within the course and scope of their employment with Defendant and in furtherance of Defendant's business.

17.    At all times material hereto, Defendant acted as an employer within the meaning of the statutes which form the basis of this matter.

18.    At all times material hereto, Plaintiff was an employee of Defendant within the meaning of the statutes that form the basis of this matter.

## JURISDICTION & VENUE

19.    The causes of action which form the basis of this matter arise under Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. § 1981, and the New Jersey Law Against Discrimination ("NJLAD").

20.    The District Court has jurisdiction over the Counts related to Title VII pursuant to 42 U.S.C. §2000e-5 and 28 U.S.C. §1331.

21.    The District Court has jurisdiction over the Courts related to 42 U.S.C. § 1981 pursuant to U.S.C. §1331.

22.    The District Court has jurisdiction over the Counts related to the NJLAD pursuant to 28 U.S.C. §1332 since the amount in controversy exceeds the sum or value of seventy-five thousand dollars ($75,000), exclusive of costs and interest and as there is complete diversity of citizenship as Plaintiff is a citizen of New Jersey and Defendant is a citizen of Washington.

23.    Venue is proper in this District Court under 28 U.S.C. §1391 (b) and 42 U.S.C. §2000e-5(f).

24.    On or about July 26, 2021, Plaintiff filed a Charge of Discrimination ("Charge") with the New Jersey Office of the Attorney General, Division on Civil Rights ("NJDCR") and the Equal Employment Opportunity Commission ("EEOC") complaining of acts of discrimination alleged herein. Attached hereto, incorporated herein and marked as **Exhibit A** is a true and correct copy of the dully filed NJDCR / EEOC Charge of discrimination.

25.    On or about July 21, 2023, the EEOC issued the Plaintiff a Notice of Right to Sue for her Charge of Discrimination. Attached hereto and marked as **Exhibit B** is a true and correct copy of the Notice.

26.    Plaintiff has fully complied with all administrative prerequisites for the commencement of this action.

## FACTS COMMON TO ALL COUNTS

27.    Ms. Langan is an individual who began working for Starbucks on November 14, 2000. She began working as a barista and was quickly promoted to Shift Supervisor ("SSV") within 6 months.  Her success continued as she was promoted to Store Manager ("SM") by May 2003. Her assigned primary location was at 522 Shopps Boulevard, in North Brunswick Township, New Jersey 08902.

28.    As an SM, Ms. Langan was responsible for providing overall leadership, planning and executing strategic operational plans, providing functional business requirements, and partner development and team building.

29.    Ms. Langan reported directly to Mr. Vaughn Clement ("Clement"), who was the District Manager. Jennifer Pivarnik ("Pivarnik") was the regional director of operations and Tracy Gaven-Bridgman ("Gaven-Bridgman") was the regional vice president of operations.

30.    Ms. Langan continued to excel in her role as an SM. She became ServeSafe certified and a Certified Trainer for Store Managers. She also earned the title of Coffee Master and received awards during her time with Starbucks, including the North Star Hero award for Area 81.

31.    The North Star Hero Award was only awarded to a handful of Starbucks Partners who displayed excellence is the areas of customer service and human interaction. According to the Executive Vice President and President of U.S. Retail, Kris Engskov, over 80,000 individuals are nominated for the North Star Hero Award and is the most prestigious award offered by Starbucks.

32.    The award was given to Ms. Langan by the former Regional Director, Marcus Eckensburger. She was taken to high end restaurant in Baltimore, celebrated, and introduced to senior management members.

33.    During her time as a Starbucks employee, Ms. Langan was always exceptional in her service and participation.  As a partner, she was well known for (a) assisting her peers; (b) creating and participating in community events; and (c) assisting with stores that were underperforming.  Concerning her efforts to assist underperforming stores, she essentially ran two (2) stores for three (3) years, with one having exceptionally high foot traffic as a mall location, all while continuously training store managers.

34.    As recently as March 15, 2020, Ms. Langan received accolades from Ms. Pavarnik, a regional Director of Operations, and Ms.  Gaven-Bridgman, the regional Vice President of Operations.

35.     Ms. Langan achieved her success while suffering from a multitude of personal ailments. Specifically, in 2007, after having an emotional breakdown which required 10 days of hospitalization, she was diagnosed with depression and anxiety disorder as a result of postpartum depression, which also caused significant damage to her thyroid.  Ms. Langan has been taking medication since 2007 to treat her depression.  Until recent events, her condition was never a barrier to her ability to perform. Ms. Langan notified the District Manager and the Regional Director on a few occasions in the past of her condition, but it was generally controlled due to the medication she was taking (antidepressants) and a relatively peaceful work environment.

36.     By March 2020, it was reported that as Starbucks settled their race discrimination case against African Americas, and beginning in 2021, as discussed in the 2021 Civil Rights Assessment, they were going to take aggressive steps against "racial injustice" going on within Starbucks.

37.     Around that same time, mass shutdowns occurred due to the COVID-19 Pandemic.

38.     As a result of the global shutdowns, operations at Starbucks became increasingly difficult and everyone at Starbucks was well aware. There was a tremendous amount of uncertainty, and there was even confusion as to whether or not Starbucks was an "essential service" and should remain open to an extent.  Schedules were up in the air, many employees were riddled with anxiety due to concerns propagated by the media, and management was peppered with questions from entry level employees about things like catastrophic pay and overtime.  During this time, Ms. Langan reached out to Ms. Pirvanik on March 20, 2020, to address the working conditions. They connected in person on March 22, 2020, when Ms. Pivarnik visited the location. No solutions were provided and the appointment amounted to nothing but an unhelpful "pep talk" by Ms. Pirvanik.

39.     Starbucks then became heavily politicized, likely driven by their recent settlement with the EEOC concerning a class action lawsuit alleging race discrimination. Toward the end March 2020, the shutdown began in New Jersey, and Plaintiff's store was then closed.  At that time, Starbucks desired to promote a pro Black Lives Matter (BLM) campaign, which we speculate was in light of their then recent media attention concerning the class action settlement with African American employees, and provided shirts for all employees to wear while at work.

40.     The shirts were delivered to Ms. Langan's store, but were sent back because the store was closed.  No one was able to sign for and accept the package, so the package was sent back to the sender. Ms. Langan was accused of intentionally sending back the package, believing that she sent it back due to her alleged opposition to Starbucks' BLM campaign, which was grounded in Ms. Langan's alleged racism. Ms. Langan denied any allegations of racism and denied having any opposition to the BLM campaign. Simply put, the store was closed at the time of delivery, due to COVID restrictions, and the package was sent back.  Ms. Langan's explanation was ignored, and the false narrative of racism began.

41.     Starbucks never attempted to redeliver the BLM shirts to Ms. Langan's store. Because Ms. Langan's store did not have any available BLM shirts, Shift Supervisor Devyn Bowles, using her own funds, made similar BLM shirts for everyone to wear, but never offered one to Ms. Langan.  When Ms. Langan asked why she did not receive a tee-shirt, Ms. Bowles responded by saying "you would never wear one anyway."  Ms. Langan asked why Ms. Bowles would say that, but Ms. Langan was ignored.  Curious and concerned with the statement made by Ms. Bowles, Ms. Langan asked Assistant Store Manager, Devon Bascunan, about the comment. He advised that she was not offered a tee-shirt because they believe that she is racist and does not

support BLM.  Ms. Langan rejects any allegation of racism, and never gave any indication of her political preferences.  Ms. Langan, as a result, was defamed and ostracized due this event.

42.    While Ms. Langan had no issues implementing the BLM shirts at her store should they have been properly delivered, she noticed the shirts made by Ms. Bowles drew unnecessary attention and hostility from certain customers, who were already frustrated and angry over Covid restrictions. Customers who were not politically in support of BLM directed their frustration at Starbucks employees. Starbucks, however, did not seem to care about this issue at all.

43.    Ms. Lanagan was not the only employee who felt that political shirts were not a good idea. Mr. Bascunan shared his opinion that Starbucks was "petty" about the shirts but ignored other important issues like poorly performing employees and the readily apparent operational issues occurring during the pandemic.

44.    In October 2020, Ms. Langan was advised by Regional Manager Vaughn Clement that the Ethic and Compliance team began to investigate her.  Ms. Langan asked Mr. Clement why she was being investigated, but Mr. Clement failed to provide any reasoning, background, updates, or information. At this point, Ms. Langan's anxiety began to deeply manifest and negatively affect her. After advising Ms. Langan of the investigation, Mr. Clement began to distance himself from Ms. Langan, and began to increase his communications with Mr. Devon Bascunan, who originally worked under Ms. Langan as an ASM. During this period, when issues or concerns arose from the North Brunswick location, Mr. Clement would only reach out to Mr. Bascunan, and no longer Ms. Langan. Shortly after the inquiry to Mr. Clement, in November 2020, Mr. Bascunan was promoted to a Store Manager (SM), likely in anticipation of Ms. Langan's future termination.

45.    By December 2020, it was apparent to Ms. Langan that there was an issue and Mr. Clement was not telling her.  Ms. Langan reached out to Mr. Clement many times about needing

a new assistant in North Brunswick because Mr. Bascunan was promoted to his own store, and they were going into the busy season of holiday. Mr. Clement told Ms. Langan she would be fine considering the COVID situation, and the holiday would not be as busy as past holidays. It put Ms. Langan and her team in a tough labor situation, and she was working over forty-five (45) to fifty (50) hours a week until she herself found a supervisor to help.  The store did very well that holiday and sales were around thirty percent (30%) over the previous year.

46.     At no point in time did Starbucks ever bothered to consult with Ms. Langan during the COVID shutdowns about any allegedly poor conduct, because she was <u>one of the only employees who had no issues coming to work</u>—so in reality, if there were any true allegations made against her, Starbucks knowingly held them on the side because they needed her labor.  Thus, ensuring business is still operational is more important than addressing any employee's concerns.

47.     Later, as Ms. Langan's immune system was likely already compromised by the substantial stress and anxiety she was suffering from, Ms. Langan unfortunately contracted COVID and needed to be placed on leave.  Due to the level of severity of the virus, amplified by the tremendous stress and anxiety Ms. Langan suffered, Ms. Langan was on leave for approximately one (1) month, and during this time, Mr. Clement began to transition more duties from Ms. Langan to Mr. Bascunan, who was her junior, and a 28-year- old Hispanic male. By this time, as facilitated by Mr. Clement, Mr. Bascunan began to take over all of Ms. Langan's duties in her assigned store located in North Brunswick, New Jersey. Specific duties taken away from Ms. Langan and given to Mr. Bascunan include, but are not limited to (a) preparing the employee schedules, (b) administering the SSV program; and (c) transferring the overall management duties of the North Brunswick location.

48.     While Ms. Langan was on protected sick leave due to COVID, Mr. Bascunan, who at the time was promoted to Store Manager (SM) at the New Brunswick location, improperly disclosed to the employees at the North Brunswick location that Ms. Langan had contracted COVID, disclosing her private information and causing a scare. By way of text message on December 30, 2020, Ms. Langan told him he was not permitted to disclose her private medical information to everyone. Mr. Bascunan disregarded her request to keep her medical information private and continued to disclose the information to the other employees, causing her to suffer anxiety from the stigmatization and criticism of the staff.  When Ms. Langan confronted Mr. Vaughn Clement about the improper disclosure on December 30, 2020 via text message, not wanting to leave a trail of evidence he asked for her to call him.  She contacted him and told him about the situation, but rather than take any remedial, he simply brushed it off and did nothing to fix the situation.

49.     It is worth noting that according to employee accounts, during Ms. Langan's time on sick leave, Mr. Bascunan had numerous discussions with Mr. Vaughn Clement concerning his desire to take over Ms. Langan's store on a permanent basis. Ms. Langan believes this is why Mr. Bascunan disclosed her private medical information—COVID is a sensitive subject, Ms. Langan had a particularly aggressive case which may have resulted in long term effects, and many employees were tremendously nervous about COVID and were terrified to contract it.  Mr. Bascunan disclosed her private information with the intention to cause shame on Ms. Langan, to create a barrier, and to ensure she would no longer want to return to her assigned location.

50.     On or about January 21, 2021, Ms. Langan called Human Resources and spoke with Ms. Tina McDonald, Human Resources Generalist, to explain that she felt she was being attacked. Ms. McDonald advised that there was nothing Human Resources could do to assist. Ms. Langan

told Ms. McDonald she felt she was being attacked by multiple employees at the same time, and those four (4) particular employees were out to get her fired. Ms. McDonald replied with "if you think they are out to get you then my concern is not about the BLM, it's about why they are out to get **you**"

51.     Suddenly, just like that, it was no longer about trying to remedy or address any concerns that Ms. Langan may have had, but rather, it was about getting rid of Ms. Langan at all costs.  Ms. Langan was going to be the one (1) particular employee that was going to be the proverbial "sacrificial lamb" to show how Starbucks takes action in support of African American employees. Meanwhile, Ms. Langan's situation was certainly the most improper situation out there, as Ms. Langan was quite contrary to what Starbucks was looking for.  She regularly enjoyed deep relationships with all members of her Starbucks family, irrespective of race, creed, culture, national origin, or gender.  Unfortunately, for the first time in 20 years, a span with an impeccable record, and without a single shred of hard, documentary evidence subject to cross examination, Ms. Langan finally felt alone, and felt like she was the one to blame.

52.     Ms. Langan was terminated from Starbucks on February 4, 2021. According to the Notice of Separation, it stated that based on findings from an Ethics and Compliance investigation (Case #126510) it was concluded that:

        a.      Ms. Langan demonstrated a lack of leadership in her failure to take ownership and responsibility on concerns reported (what were these reported concerns?)

        b.      Ms. Langan showed poor judgment in discussing details of the investigation with one of her direct reports after specifically being directed not to.

c.      Ms. Langan engaged in a pattern of behavior that is not reflective of the company's Mission & Values and expectations of partner conduct, including the Anti-Harassment Standard.

53.    Ms. Langan contends that she was never warned that she was going to be terminated nor was ever given an opportunity to present her side or defend herself.  After getting the termination notice, she approached Mr. Clement about this to discuss what was going on.  Mr. Clement advised that he "couldn't respond," and that she would be notified by partner resources.  This was a runaround.

54.    At the Unemployment Hearing (UI Hearing) dated July 9, 2021, Mr. Clement reported that one of the reasons for Ms. Langan's termination was that during the course of the investigation, she was instructed not to discuss details of the investigation with other employees. Ms. Clement advised that Ms. Langan violated the confidentiality rules maintained by Starbucks.  This is false and supported by documentary evidence. By the close of the investigation, it became very clear that it was Ms. Hogan who routinely would report to Ms. Langan on her own volition, without solicitation from Ms. Langan, everything that was told to Ms. Hogan by the Ethics & Compliance team. In fact. Ms. Langan routinely told Ms. Hogan that she could not speak to her—even the day before her termination, on February 3, 2021, Ms. Langan advised Ms. Hogan about her need to keep matters quiet.

55.    Under the law, Starbucks has no right to obstruct employees from speaking about working conditions, but that is not even the case here since Ms. Langan maintained and complied with Starbucks improper prohibition about discussing working conditions.

56.    Also, Ms. Langan found out at the UI Hearing that Starbucks felt that the alleged discriminatory comments were far too egregious, and she needed to be terminated.  However, this

is disingenuous and rather, they <u>failed to conduct a true investigation, failed to permit Ms. Langan</u> <u>to testify in detail for herself, and simply dismissed her contention that she denied the allegations.</u> <u>Rather, they assumed that the alleged testimony from others was truthful, more so than Ms.</u> <u>Langan</u>.  To Starbucks, the fact that she was a +20-year employee who always was truthful, with a stellar record to support, meant nothing.  The rationale and assumption that the other employees were more credible than Ms. Langan was based on absolutely nothing except the fact that they believed this would be helpful to show how they are punishing White people, while supporting African Americans. Starbucks must have believed that this would be a great way to show their support for African Americans after a class action lawsuit against them for discriminating against African Americans.

57.    At the UI Hearing, Mr. Clement fictitiously testified that Ms. Langan had an opportunity to appeal.  This was absolutely false. According to Mr. Clement, Ms. Langan would have had an opportunity to appeal and would have been contacted by the Ethics & Compliance Team or the Human Resources Team.  When so much as questioned how the investigation even worked, Mr. Clement deflected and advised that he did not know.  He contended that when an investigation takes place, everything is frozen shut.  If that is the case, how was there even an opportunity to discuss this matter with management, let alone appeal? As this was the case, and no appeal was ever present, Starbucks failed miserably because no one reached out to Ms. Langan.

58.    In fact, it was Ms. Langan who reached out to her Regional Director of Operations, Ms. Jennifer Pivarnik and her boss, Tracy Gaven-Bridgman.  On February 5, 2021, Ms. Langan contacted them by way of text message, and advised that she was fired in the morning of February 4, 2021, and she did not understand why, because she did not do anything wrong. Ms. Pivarnik messaged Ms. Langan that there was nothing she was able to do to support her. Ms. Langan was

to reach out to Ms. Melanie Keen, the Partner Resource Manager at Starbucks, for further information.  Ms. Langan reached out to Ms. Keen and was advised by Ms. Keen that based on her findings, her termination was proper.

59.     A text message through the Company phone cannot realistically be considered an "appeal" by Starbucks, as so highly touted by Mr. Clement on the UI Hearing call. Perhaps such a system would work for a small business, but not Starbucks. Starbucks has a 141-billion-dollar market cap and approximately 349,000 employees (as of September 2020). There is no way Starbucks can realistically say that an informal text message qualifies as an "appeal."

60.     Regarding the shirt incident at the UI Hearing, Mr. Clement put the blame on Ms. Langan, advising that it was her responsibility to follow up to request the shirts, but this is incorrect on its face.  Why would Ms. Langan be responsible to follow up? The package's attempted delivery occurred when the Store was closed, so Ms. Langan did not initially know of the delivery attempt. Furthermore, undeliverable packages are presumably sent back to the sender, so if Starbucks was the sender, and it went back to them, why would they not re-attempt delivery? Why would they permit employees to pay out of pocket for the BLM shirts, when Starbucks was the one promoting the campaign? Ms. Langan many times asked Mr. Clement to follow up on the shirts and was told there was nothing he could do since (a) she missed the opportunity as her store was closed, and (b) by the time of this request, the shirts were sold out.  Ms. Langan tried on her own order the shirts on multiple occasions, however, they were sold out.

61.     In another event, Ms. Langan overheard a conversation between the staff over the communication system, in which a comment made by a SSV, Ms. Isaura Lopez-Perez, began to discuss how "minorities couldn't be racist, and you can't be racist toward white people." Ms. Langan, not wanting this non-work-related conversation to continue while employees were on the

clock, reprimanded her over the communication system. However, this resulted in Ms. Langan being reprimanded and further advancing the harmful and improper notion that Ms. Langan was racist.

62.    At some point after this, first discovered at the UI Hearing, Ms. Langan was notified of a situation concerning an alleged comment she made about a Latina and Walmart.  Ms. Clement pointed out that Ms. Langan made an offensive comment concerning the Latina population.  There were no specifics other than a stray comment here. While there is no other information of an alleged discriminatory comment, there was a situation where Ms. Jessica Ardita was frustrated about something, and the rumor was that Ms. Langan offended her.  Ms. Langan asked Ms. Ardita if something was wrong, or if she offended her, and Ms. Ardita advised that she was just frustrated due to all the medical issues she had going on, told Ms. Langan that she loved Ms. Ardita and gave her a hug.

63.    Furthermore, at the UI Hearing, Ms. Langan was notified by Mr. Clement of two situations, without a date presented, in which the colloquial term "nigga" was allegedly stated or presented. Those situations were described as follows:

    a.    Mr. Clement advised that an employee reported that while he was talking to himself in the back room, and when Ms. Langan confronted him, she allegedly stated "sometimes you just got to speak the realist nigga in the room." Ms. Langan denied this. In fact, the sentence  was said by another employee, Mr. Jalen Gill, over the headset.

    b.    Mr. Clement also reported that Ms. Langan permitted employees to listen to music which used the word "nigga' in it, and that Ms. Langan joined in singing, repeating the term.  Ms. Langan denies "joining in singing," but does not deny that she permitted employees who put on the radio to play rap music, which used the term

frequently. Additionally, Ms. Langan advised that Mr. Clement was there on numerous occasions where the music was played.

64.     Each of these instances was introduced by Starbucks at the UI Hearing, and never discussed with Ms. Langan prior. Regardless, Ms. Langan denies ever making the first comment, and denies that she was joining in singing in the second instance.

65.     While it was clear that no one within Starbucks was going to listen to Ms. Langan, or even give Ms. Langan an opportunity to defend herself, Ms. Langan needed to get to the truth and see if anyone really had issues with her. Ms. Langan contacted those who she believed were involved in the investigation, specifically African American employees she worked with, and she contends that no one received any call from Human Resources for an investigation.

66.     Ms. Langan also contends that the investigation into her allegedly wrongful behavior was performed improperly. To determine if Ms. Langan ever engaged in racist commentary against African Americans, Starbucks interviewed Jessica Ardita (Hispanic), Sarah Farghley (Egyptian), Devon Bascunan (Hispanic), Corrine Hogan (White) and Devyn Bowles (White)—not one single African American. Meanwhile, not one single African American employee had anything negative to say about Ms. Langan. In fact, African American employees were mind blown about her termination and the allegations against Ms. Langan. Of those who were surprised were Mr. Jordan Way (African American) and Ms. Zoe Hill (African American), neither who were contacted during the investigation.

67.     After Ms. Langan's termination, she was then replaced by no one other than Mr. Bascunan, who was now employed as a SM in Ms. Langan's store. Immediately after Ms. Langan's termination, Mr. Clement transferred Mr. Bascunan to the North Brunswick location, and was happy to have Ms. Langan replaced. Ms. Langan contends that Mr. Clement favors men

over women and has no record of terminating any men that Ms. Langan can recall. Ms. Langan recalls that he may have fired 2 females in the past.

68.    After her termination, in a tremendous show of support, Ms. Loranny Nunez, a former employee and law student, unilaterally decided to prepare a Letter In Support of Ms. Langan. In a letter dated March 26, 2021, prepared by Ms. Loranny Nunez on behalf of Ms. Danielle Langan, sent to Starbucks CEO, Kevin Johnson, Starbucks was made aware of the frustration caused by the improper termination of Ms. Langan.

69.    According to the Letter In Support, Ms. Langan was terminated improperly, and was fictitiously accused of racism. Ms. Nunez contends that she used to work for Ms. Langan and that no allegations of racism were to be supported. The Letter In Support was signed by eleven (11) current and former members of Starbucks, including Ms. Nunez.

70.    No one at Starbucks ever responded to the Letter In Support, nor did they even acknowledge receipt.

71.    Ms. Langan is convinced that the reason for her termination was predicated on race discrimination, retaliation, and disability discrimination. For years, Ms. Langan's performance has been stellar, even in light of her known postpartum depression and anxiety, so much so that she has even received one of the highest awards given by Starbucks. However, ever since her alleged refusal to participate in Starbucks' BLM campaign (which was not the case), she has been unfairly and improperly stereotyped as being racist. Additionally, the moment she contracted COVID and was required to go on leave due to the severity, she had her responsibilities and duties taken away from her, as Starbucks knew full well their intention to terminate her. Mr. Bascunan, a younger, non-white male, was selected as her replacement. Thus, it is clear that she has been

treated disparately, and she has been wrongfully terminated for fictitious reasons, and not even given an opportunity to respond back in the investigation.

72.    Similarly situated employees do not see such kind of punishment, even for more egregious allegations.

73.    A perfect example is Mr. Garret McCloud, who is an African American male, who was alleged to have been sexually harassing women in the workplace.  After a subpar investigation, they concluded that there was no incident of sexual harassment, and that the multiple females were found to not have any claim.

74.    Another example is Cranford Manager, Leo Rivera, a Hispanic male, who is well known for offensive commentary, calling employees who he believes are slow "retards" and other explicative comments that have no place for paper.  The offended employee called into corporate to report the behavior, and not a single preventative step, or even investigation, has taken place.

75.    A third example is Ms. Jessica Ardita, Hispanic female, who was cited for making a comment to Ms. Roxana Maroun, white female, asking if she "sucked dick." Ms. Maroun was tremendously offended by this statement and reported it to the Ethics and Compliance committee, and not a single disciplinary or corrective step was taken.  Naturally, because Starbucks favors minorities over white people, Starbucks has no interest in punishing Ms. Ardita.

76.    For Ms. Langan, if she received only a tiny bit of the treatment Mr. McCloud received, she would have fared better. For Ms. Langan, there was no investigation, no proof ever provided, no evidence, no opportunity to defend herself and absolutely no consideration for her situation as a single mother of three (3) children.

## FIRST CAUSE OF ACTION

### (Race Discrimination in Violation of Title VII of the Civil Rights Act)

77.    Plaintiff incorporates by reference paragraphs 1 through 69 above, as if set forth herein in their entirety.

78.    Pursuant to 42 U.S.C. § 2000e (f), plaintiff qualifies as an employee under Title VII.

79.    Pursuant to 42 U.S.C. § 2000e (b), Defendants qualify as an employer pursuant to Title VII.

80.    By committing the foregoing acts of discrimination and harassment against Plaintiff, Defendant has violated Title VII.

81.    Pursuant to 42 U.S.C. § 2000e-2(a)(1), it is an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

82.    Said violations were done with malice and/or reckless indifference to Plaintiff's protected rights and warrant the imposition of punitive damages.

83.    As a direct and proximate result of Defendant's violation of Title VII, Plaintiff has suffered the damages and losses set forth herein and has incurred attorneys' fees and costs.

84.    Plaintiff will continue to suffer irreparable injury and monetary damages as a result of Defendant's discriminatory acts unless and until this Court grants the relief requested herein.

85.    No previous application has been made for the relief requested herein.

## SECOND CAUSE OF ACTION

### (Race Discrimination in Violation of 42 U.S.C. § 1981)

86.    Plaintiff incorporates by reference paragraphs 1 through 77 above, as if set forth herein in their entirety.

87.     By committing the foregoing acts of discrimination and harassment against Plaintiff, Defendant has violated Title VII.

88.     Said violations were done with malice and/or reckless indifference to Plaintiff's protected rights and warrant the imposition of punitive damages.

89.     As a direct and proximate result of Defendant's violation of Title VII, Plaintiff has suffered the damages and losses set forth herein and has incurred attorneys' fees and costs.

90.     Plaintiff will continue to suffer irreparable injury and monetary damages as a result of Defendant's discriminatory acts unless and until this Court grants the relief requested herein.

91.     No previous application has been made for the relief requested herein.

### THIRD CAUSE OF ACTION

### (Race Discrimination in Violation of the NJLAD)

92.     Plaintiff incorporates by reference paragraphs 1 through 83 above, as if set forth herein in their entirety.

93.     Pursuant to N.J. Stat. §10:5-5 (f), the plaintiff qualifies as an employee under the NJLAD.

94.     Pursuant to N.J. Stat. §10:5-5 (e), Defendants qualify as an employer pursuant to the NJLAD.

95.     By committing the foregoing acts of discrimination and harassment against Plaintiff, Defendant has violated the NJLAD.

96.     Said violations were done with malice and/or reckless indifference to Plaintiff's protected rights, and warrant the imposition of punitive damages.

97.     As a direct and proximate result of Defendant's violation of the NJLAD, Plaintiff has suffered the damages and losses set forth herein and has incurred attorneys' fees and costs.

98.    Plaintiff will continue to suffer irreparable injury and monetary damages as a result of Defendant's discriminatory acts unless and until this Court grants the relief requested herein.

99.    No previous application has been made for the relief requested herein.

## FOURTH CAUSE OF ACTION

### (Retaliation under Title VII)

100.    Plaintiff incorporates by reference paragraphs 1 through 91 above, as if set forth herein in their entirety.

101.    Pursuant to 42 U.S.C. § 2000e (f), plaintiff qualifies as an employee under Title VII.

102.    Pursuant to 42 U.S.C. § 2000e (b), Defendants qualify as an employer pursuant to Title VII.

103.    By committing the foregoing acts of discrimination and harassment in retaliation against Plaintiff, Defendant has violated Title VII.

104.    Said violations were done with malice and/or reckless indifference to Plaintiff's protected rights, and warrant the imposition of punitive damages.

105.    As a direct and proximate result of Defendant's violation of Title VII, Plaintiff has suffered the damages and losses set forth herein and has incurred attorneys' fees and costs.

106.    Plaintiff will continue to suffer irreparable injury and monetary damages as a result of Defendant's discriminatory acts unless and until this Court grants the relief requested herein.

107.    No previous application has been made for the relief requested herein.

## NINTH CAUSE OF ACTION

### (Retaliation under NJLAD)

108.    Plaintiff incorporates by reference paragraphs 1 through 99 above, as if set forth herein in their entirety.

109.    Pursuant to §10:5-1 et., seq., plaintiff qualifies as an employee under the NJLAD.

110.    Pursuant to §10:5-1 et., seq., Defendants qualify as an employer pursuant to the NJLAD.

111.    By committing the foregoing acts of discrimination and harassment against Plaintiff, Defendant has violated the NJLAD.

112.    Pursuant to N.J. Stat. § 10:5-12 d, for any person to take reprisals against any person because that person has opposed any practices or acts forbidden under this act or because that person has sought legal advice regarding rights under this act, shared relevant information with legal counsel, shared information with a governmental entity, or filed a complaint, testified or assisted in any proceeding under this act or to coerce, intimidate, threaten or interfere with any person in the exercise or enjoyment of, or on account of that person having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by this act.

113.    Said violations were done with malice and/or reckless indifference to Plaintiff's protected rights, and warrant the imposition of punitive damages.

114.    As a direct and proximate result of Defendant's violation of the NJLAD, Plaintiff has suffered the damages and losses set forth herein and has incurred attorneys' fees and costs.

115.    Plaintiff will continue to suffer irreparable injury and monetary damages as a result of Defendant's discriminatory acts unless and until this Court grants the relief requested herein.

116.    No previous application has been made for the relief requested herein.

## SIXTH CAUSE OF ACTION

### (Discrimination in violation of the ADA)

117.    Plaintiff incorporates by reference paragraphs 1 through 107 above, as if set forth herein in their entirety.

118.    By committing the foregoing acts of discrimination and harassment against Plaintiff, Defendant has violated the ADA.

119.    In order to establish a violation of Title II of the ADA by these defendants, a plaintiff must show: (1) that he or she "has a disability;" (2) "is otherwise qualified for the employment or benefit"; (3) that he or she was "excluded from the employment or benefit . . . solely on the basis of the disability;" and (4) the provider of the "service[], program[], or activit[y]" is "a public entity."

120.    Said violations were done with malice and/or reckless indifference to Plaintiff's protected rights and warrants the imposition of punitive damages.

121.    As a direct and proximate result of Defendant's violation of the NJLAD, Plaintiff has suffered the damages and losses set forth herein and has incurred attorneys' fees and costs.

122.    Plaintiff will continue to suffer irreparable injury and monetary damages as a result of Defendant's discriminatory acts unless and until this Court grants the relief requested herein.

123.    No previous application has been made for the relief requested herein.

### SEVENTH CAUSE OF ACTION

### (Discrimination in violation of the NJLAD)

124.    Plaintiff incorporates by reference paragraphs 1 through 113 above, as if set forth herein in their entirety.

125.    Pursuant to §10:5-1 et., seq., plaintiff qualifies as an employee under the NJLAD.

126.    Pursuant to §10:5-1 et., seq., Defendants qualify as an employer pursuant to the NJLAD.

127.     By committing the foregoing acts of discrimination and harassment against Plaintiff, Defendant has violated the NJLAD.

128.     Said violations were done with malice and/or reckless indifference to Plaintiff's protected rights, and warrant the imposition of punitive damages.

129.     As a direct and proximate result of Defendant's violation of the NJLAD, Plaintiff has suffered the damages and losses set forth herein and has incurred attorneys' fees and costs.

130.     Plaintiff will continue to suffer irreparable injury and monetary damages as a result of Defendant's discriminatory acts unless and until this Court grants the relief requested herein.

131.     No previous application has been made for the relief requested herein.

## EIGHTH CAUSE OF ACTION

### (Discrimination in violation of the ADEA)

132.     Plaintiff incorporates by reference paragraphs 1 through 121 above, as if set forth herein in their entirety.

133.     The Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C.S. § 621 et seq., prohibits employers from discharging any individual because of such individual's age. 29 U.S.C.S. § 623(a)(1).

134.     By committing the foregoing acts of discrimination and harassment against Plaintiff, Defendant has violated the ADEA.

135.     Said violations were done with malice and/or reckless indifference to Plaintiff's protected rights, and warrant the imposition of punitive damages.

136.     As a direct and proximate result of Defendant's violation of the NJLAD, Plaintiff has suffered the damages and losses set forth herein and has incurred attorneys' fees and costs.

137.    Plaintiff will continue to suffer irreparable injury and monetary damages as a result of Defendant's discriminatory acts unless and until this Court grants the relief requested herein.

138.    No previous application has been made for the relief requested herein.

## NINTH CAUSE OF ACTION

### (Intentional infliction emotional distress)

139.    Plaintiff incorporates by reference paragraphs 1 through 127 above, as if set forth herein in their entirety.

140.    In order to prevail on a claim for intentional infliction of emotional distress, the conduct complained of must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency; be regarded as atrocious, and utterly intolerable in a civilized community. Taylor v. Metzger, 152 N.J. 490, 509, 706 A.2d 685 (1997).

141.    By committing the foregoing acts of discrimination and harassment against Plaintiff, Defendant's conduct was outrageous and extreme.

142.    Said acts were so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, Plaintiff has suffered an injury and is entitled to punitive damages.

143.    As a direct and proximate result of Defendant's intentional infliction of emotional distress, Plaintiff has suffered the damages and losses set forth herein and has incurred attorneys' fees and costs.

144.    Plaintiff will continue to suffer irreparable injury and monetary damages as a result of Defendant's discriminatory acts unless and until this Court grants the relief requested herein.

145.    No previous application has been made for the relief requested herein.

## TENTH CAUSE OF ACTION

### (Negligent infliction of emotional distress)

146.    Plaintiff incorporates by reference paragraphs 1 through 134 above, as if set forth herein in their entirety.

147.    "A claim of direct, negligent infliction of emotional distress," may be viable where the plaintiff claims damages proximately caused by a breach of a duty owed by the defendant. *Lascurain v. City of Newark*, 349 N.J. Super. 251, 277, 793 A.2d 731 (App. Div. 2002). To be compensable, a plaintiff must demonstrate he or she suffered from "severe," *McDougall v. Lamm,* 211 N.J. 203, 215, 48 A.3d 312 (2012), or "genuine and substantial" emotional distress. Lascurain, 349 N.J. Super. at 277, 793 A.2d 731. *Clark v. Nenna*, 465 N.J. Super. 505, 511-512

148.    By committing the foregoing acts of discrimination and harassment against Plaintiff, Defendant's breached its duty owed to the Plaintiff.

149.    Said acts were the direct and proximate cause of Plaintiff's severe, genuine, and substantial damages.

150.    As a direct and proximate result of Defendant's conduct, Plaintiff has suffered the damages and losses set forth herein and has incurred attorneys' fees and costs.

151.    Plaintiff will continue to suffer irreparable injury and monetary damages as a result of Defendant's discriminatory acts unless and until this Court grants the relief requested herein.

152.    No previous application has been made for the relief requested herein.

## ELEVENTH CAUSE OF ACTION

### (Negligent Retention, Supervision, and Hiring under State Law)

153.    Plaintiff incorporates by reference paragraphs 1 through 139 above, as if set forth herein in their entirety.

154.    In order to state a claim for negligent supervision, evaluation and/or retention, a Plaintiff must allege that (i) the employer knew or should have known an employee was unfit,

incompetent, or dangerous to hire; and (ii) through the employer's negligence, the Plaintiff was injured by the unfit, incompetent, or dangerous employee. See *G.A.-H. v. K.G.G.*, 238 N.J. 401, 416, 210 A.3d 907 (2019) (citing *Di Cosala v. Kay*, 91 N.J. 159, 173, 450 A.2d 508 (1982)). Similarly, in order to prevail on a theory of negligent training, supervision, evaluation or retention, a Plaintiff must show that (i) an employer knew or should have known that a failure to properly train, supervise, evaluate, or terminate an employee posed a risk, and (ii) the employer's negligent failure to take appropriate action cause the Plaintiff injury. See G.A.-H v. K.G.G., 238 N.J. 401, 416, 210 A.3d 907 (2019).

155.    By committing the foregoing acts of discrimination and harassment against Plaintiff, Defendant has negligently hired employees they knew or should have known were unfit and incompetent.

156.    Said hiring was done with malice and/or reckless indifference to Plaintiff's protected rights, and warrant the imposition of punitive damages.

157.    As a direct and proximate result of Defendant's negligent conduct, Plaintiff has suffered the damages and losses set forth herein and has incurred attorneys' fees and costs.

158.    Plaintiff will continue to suffer irreparable injury and monetary damages as a result of Defendant's conduct unless and until this Court grants the relief requested herein.

159.    No previous application has been made for the relief requested herein.

## RELIEF

WHEREFORE, Plaintiff seeks damages and legal and equitable relief in connection with Defendant's improper conduct, and specifically prays that the Court grant the following relief to Plaintiff by:

a.      Declaring the acts and practices complained of herein to be in violation of 42 U.S.C. § 1981;

b.      Declaring the acts and practices complained of herein to be in violation of the NJLAD;

c.      Enjoining and permanently restraining the violations alleged herein;

d.      Entering judgment against the Defendant and in favor of the Plaintiff in an amount to be determined;

e.      Awarding compensatory damages to make the Plaintiff whole for all lost earnings, earning capacity, and benefits, which Plaintiff has suffered as a result of Defendant's improper conduct;

f.      Awarding compensatory damages to Plaintiff for past pain and suffering, emotional upset, mental anguish, humiliation, and loss of life's pleasures, which Plaintiff has suffered as a result of Defendant's improper conduct;

g.      Awarding punitive damages to Plaintiff under Title VII;

h.      Awarding punitive damages to Plaintiff under 42 U.S.C. § 1981;

i.      Awarding punitive damages to Plaintiff under the NJLAD;

j.      Awarding Plaintiff other such damages as are appropriate under Title VII, 42 U.S.C. § 1981, and the NJLAD;

k.      Awarding Plaintiff the costs of suit, expert fees and other disbursements, and reasonable attorneys' fees; and

l.      Granting such other and further relief as this Court may deem just, proper, or equitable including other equitable and injunctive relief providing restitution for past violations and preventing future violations.

## DEMAND FOR JURY TRIAL

Plaintiff DANIELLE LANGAN, by operation of this Verified Complaint, hereby demands a trial by jury as to all matters so triable.

## DEMAND FOR DISCOVERY OF INSURANCE COVERAGE

Pursuant to Rule 4:10-2(b), demand is made that Defendants disclose to Plaintiffs attorney whether or not there are any insurance agreements or policies under which any person or firm carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in this action or indemnify or reimburse for payment, and provide Plaintiff's attorney with true copies of those insurance agreements or policies, including, but not limited to, any and all declaration pages, specimens, or endorsements. This demand shall include and cover not only primary coverage, but also any and all excess, catastrophe and umbrella policies.

## CERTIFICATION

Pursuant to Local Civil Rule 11.2, I hereby certify to the best of my knowledge that the matter in controversy is not the subject of any other action pending in any court or of any pending arbitration or administrative proceeding.

Respectfully Submitted,

Dated:   Astoria, New York
         August 16, 2023

**VINCENT MILETTI, ESQ.**
The Law Office of Vincent Miletti, Esq.
10 Halletts Point, Suite 1742
Astoria, New York 11102
609-353-6287 (Office)
VMiletti@Milettilaw.com (Email)
NJ Bar 078322013
*Attorney for Plaintiff*

To    Michael Kessel, Esq.
      Littler Mendelson
      One Newark Center

1085 Raymond Blvd, 8th Floor
Newark, New Jersey 07102
*Attorney for Defendants*

## VERIFICATION

STATE OF NEW YORK    )

                           ) SS

COUNTY OF KINGS      )

       MS. DANIELLE LANGAN, hereby attests, affirms, verifies, deposes, and says that she is the Plaintiff in this matter, that he has read the foregoing Verified Complaint and that she believes that the facts set forth therein are true and correct to the best of her knowledge, information, and belief.  Ms. Danielle Langan's knowledge or information and belief, is based on personal knowledge of the facts of this case.

MS. DANIELLE LANGAN

Sworn to me, the undersigned, on

this 16ᵗʰ day of August, 2023.

VINCENT MILETTI, ESQ.
Notary Public - State of New York
No. 02MI6380651
Qualified in Kings County
My Commission Expires 09/10/2026

NOTARY PUBLIC

## <u>CERTIFICATE OF SERVICE IN NYSCEF SYSTEM</u>

I certify that this document is being filed through the Public Access to Court Electronic Records ("PACER") Court Electronic Filing (ECF) System, which serves as counsel for other parties who are registered participants as identified on the system in the Case Detail tab. An electronic copy of the foregoing was sent to all registered participants via ECF Confirmation Notice. Any counsel for other parties, or for any parties, who are not registered participants are being served by first class mail on the same date of electronic filing.

Vincent Miletti, Esq.